## Case No. 16,465.

UNITED STATES v. THIRTY-NINE TRUNKS.

[See Case No. 15,885.]

---

## Case No. 16,465a.

UNITED STATES v. THIRTY-ONE BOXES, etc.

[Bett's Scr. Bk. 163.]

District Court. S. D. New York. July 7, 1833.

VIOLATIONS OF CUSTOMS LAWS—FRAUDULENT ENTRIES—FORFEITURES—FALSE DESCRIPTIONS—ANCHOR IRON, BOLT IRON, AND CABLES.

[1. In section 4 of the act of May 28, 1830 [4 Stat. 410], which declares, among other things, that if any package or invoice "be made up with intent, by false valuation or extension, or otherwise," to evade or defraud the revenue,

the same shall be forfeited, the words "or otherwise" are to be construed as applying only to cases of the same character with those enumerated, and not to any of a different and independent description. They would include, however, an attempt to enter anchors or bar iron as "anchor iron," parts of chain cables as "links," and bolt iron as "straight links," if this were done with intent to evade or defraud the revenue.]

[2. Pieces of hammered iron two feet long, six and three quarters inches square at one end, and tapering to one and a half inches at the other, which are prepared in this form for the purpose of being welded together to make anchors, are not subject to forfeiture under the statute for being entered in the invoice as "anchor iron": it being shown that they are known under this term in trade and commerce, and that they could not properly be described either as "anchors" or as "bar iron".]

[3. Pieces of round iron cut in suitable lengths, some being straight and others curved or bent to a U shape, and which are adapted to be formed into the links of cables, are properly invoiced as "straight, bent, and turned links," respectively, it appearing that they are known under those terms in trade and commerce.]

[4. In the description "cables and parts thereof" as used in the act of 1824, the words "parts thereof" apply only to parts of cables which retain the properties of complete cables, that is, to a number of links connected together, so as to form part of a chain, and not to single detached links, though complete as such; and especially not to pieces of round iron cut to the proper length, and which are either straight or partially bent into shape, but not welded together, so as to form completed links.]

[5. The statute of 1830 does not subject goods to forfeiture merely because the importer has attempted to enter them at a rate of duty less than that to which they are ultimately found to be liable, when there is in fact no false description of them with intent to defraud the revenue.]

[6. The fact that the public appraisers and two merchants sworn to assist in the examination of the goods report that in their opinion an importation and entry was fraudulently made with intent to evade payment of the proper duties, and recommend the seizure thereof, is sufficient ground for granting a certificate of probable cause of seizure, although it is held that there is no ground of forfeiture.]

[This was a libel of forfeiture against certain boxes and packages of imported articles, alleging a false and fraudulent invoice and entry, with intent to evade payment of the proper duties.]

These articles were imported in the Wm. Byrnes from Liverpool, and invoiced, 29 boxes bent links, 2 boxes straight links, 42 packages twin links, and 10 pieces of anchor iron, with their respective weights, cost, &c. The importer, by his attorney, John [F.] Sarchet, claimed to enter them at the custom house at 15 per cent. ad valorem under the act of 1816, as non-enumerated articles manufactured in part—and denied that they were a complete manufacture of iron, which pays 25 per cent. ad valorem. Attached to and forming part of the invoice, was the affidavit of the shipper at Liverpool that he was in the habit of receiving and giving orders for links and anchor iron, and that they were the articles

in commerce known by that name—and also the affidavit of the manufacturers that these were articles of commerce well known by those names, and fit for nothing but scrap iron, unless made into chains and anchors, and for these purposes much more valuable than bar iron. These affidavits were very full, detailing the proofs by which links and anchor iron are made from the raw material, and everything in relation thereto. These the importer submitted to the collector, attached to his invoice, who handed them to Mr. Mead, the appraiser, who made the following report: "Appraiser's Office, Jan'y. 18, 1833. .S. Swartwout, Esq., Collector: The two invoices handed you herewith of Mr. Thomas Barrow of Liverpool, offered for entry, contain the following articles viz.: Bolt or chain iron of various diameters, cut up in ends of different lengths, for the making of links for chains. Some are straight, some bent thus U, and others of an oblong form, turned or twisted thus ∩, the ends tapering to a point and flat for welding. The straight ends are of the diameter of 72 inch. and cut in uniform lengths of 5 inches. The ends bent thus U are 72⅝ and ⁹/₁₆ of an inch in diameter and in length 5½, 6, and 7 inches. These, together with the straight ends before named, are simply cut from the bar or bolt iron while in a heated state—varying in length and in diameter according to the size or strength required. The oblong or turned links are ¹⁵/₁₆ of an inch in diameter and 11½ inches long, bent while heated, and in that state cut diagonally at the side by the aid of a machine called a 'mandrel,' and then packed for purposes of transportation on a round bolt of iron 10½ feet long and 1½ inches in diameter with a large head or·flat piece of iron at one end of the bolt, sufficiently large to prevent the links from passing over, and at the other end by a key securing them from coming off. The two pieces called 'anchor iron' are two feet long 6¾ inches square at the large end, and tapering down to 1½ inches at the other end, and is in fact and truth hammered iron. It is unlike bar iron in every particular. Each piece besides is prepared separately by itself, and then welded together for anchors. I would particularly recommend to your perusal the oath or affirmation attached to this invoice of anchor iron. It sets forth in a clear and explicit manner the article in question —without a word from me—that it is intended for anchors there cannot be a doubt —that they are not anchors there cannot be a shadow of a doubt, and that they are not manufactures of iron suited to any known purpose it is also equally clear and conclusive. The oath or affirmation attached to the invoice of bolt or chain iron is in the main equally clear and comprehensive as regards the facts therein set forth, save that part which draws deductions from premises not warranted by facts, which part is marked in the margin of the affirmation by inverted lines. I cannot but consider this a case where the object of the owner is to evade the payment of duties imposed by the laws, and one so clearly and palpably wrong as not to admit of any well grounded defence under any view of the case. They cannot in truth be considered as manufactures, within the intent and meaning of the law; that they are not chains, no one will be foolish enough to aver; but that they are intended for links for chains, no one will deny. Under what view of the case, then, can they be called 'manufactures of iron'? We might with the same propriety call a bar of iron, a manufactured article. I am respectfully, your ob't servant, (Signed) A. B. Mead. The bolt or chain iron, although cut up into pieces for links, should be classed for duty as 'bar or bolt iron, made wholly or in part by rolling,' and the anchor iron as 'hammered iron.' (Signed) A. B. M." The collector then, on suspicion that a fraud had been committed in making the entry, ordered the packages to be examined by Nicholas Saltus and Daniel Ayres, two merchants in New York City, who reported to the collector as follows: "Schedule D. New York, Jan. 21, 1833. David S. Lyon, Esq., Dep'y Collector of Port of New York—Sir: In answer to your letter of the 18th, requesting us to report to you our opinion of the iron entered by Mr. Sarchet in this custom house, imported in the ship Wm. Byrnes, beg leave to state that the said iron is what is represented in the certificates, viz. three descriptions of links well known to the trade as parts of chain cables, requiring but a small process to make them complete chain cables, and parts of anchors ready to be joined together. The tariff expressly states that chain cables, or parts of chains, shall pay 3 per lb., and anchors or parts of anchor 2 per lb. This was well known to Mr. Sarchet, and his attempt to enter them under any other form is an attempt of fraud on the revenue, and consequently in our opinion ought to be seized. Respectfully we are, &c. Nicholas Saltus. Daniel Ayres."

The articles were thereupon libeled as bar and bolt iron—"short bars and bolts of iron, falsely denominated links and anchor iron"— and also for that "the invoice and packages were falsely made up with intent, by a false valuation, extension, or otherwise, to defraud the revenue"—that the goods were described as manufactured articles subject to 25 per cent. ad valorem, when they were iron in bars and bolts, and subject to a specific duty—that the packages contained articles not described in the invoice—that the packages were examined by two merchants and found to differ in their contents from the entry.

On the trial, the substance of the testimony was this: The entry clerk of the custom house testified that Mr. Sarchet came to his

desk, and proposed to enter this invoice at 15 per cent. ad valorem, but witness would not so enter it, and an entry was then made out at 25 per cent. ad valorem. He asked Mr. Sarchet what he wanted it charged at. He replied 15 per cent. Bonds were executed in blank.

Mr. Mead, United States appraiser, testified—that his report was correct, and he found this invoice, pieces of iron intended for links of chains, and he was bound to say that the papers attached to the invoice were correct in every particular, and squared with the information he received, and confirmed it. The straight links he considered braziers' rods, but in commerce they would not be known as such. That he had no experience in iron, but what he had acquired as appraiser.

Mr. Saltus, for the United States, said that he was an importer of iron, and signed the report with Mr. Ayres to the collector as above, which was correct,—that it costs about 2 to 3½ cents to make these links into chains —links are known in commerce as distinctive articles. In orders you merely give the diameter, and the manufacturer has rules for the length. The government advertise for straight and bent links, and witness has supplied them. Also for anchor iron in parts, but he never supplied anchor iron—chain cables are invariably imported 90 fathoms, in sections of 15 fathoms connected by shackles.

Mr. Ayres, for the United States, said that he signed the above report—and it is correct. He should think a link a part of a chain, and thinks the trade would so consider it—should think anchor iron parts of anchors. He sells links, and anchor iron—he invoices them as links and anchor iron—they are ordered by those names, and so known in commerce. He should order them by that name from abroad. Being asked if he so ordered, sold, bought and invoiced them, by what name he would enter them—the district attorney objected and the judge ruled he must not answer the question.

Mr. Ayres further said, to make the turned links into chains he thought would cost 2½ cents per lb. Imagines Sarchet's parts of anchors only wanted welding, a hole punched, and a ring, to make anchors of them.

Mr. Jacobs, clerk in the appraisers' office, said he knew very little of iron—supposed this anchor iron for the purpose of making anchors. Until this trial supposed a link considered by everybody a part of a chain.

Mr. Barker, collector of Philadelphia, said Sarchet in 1829 contended that the anchor iron was not parts of anchors, but anchor iron subject to 15 per cent.—But for the law of 1832, witness would have considered links parts of bolt iron, and so charged them. The treasury decided before 1832 that they were not parts of chains, and the anchor iron not parts of anchors. I had charged the links as bolt iron and the anchor iron as anchors,

as I always fix the highest rate of duty where there is a doubt.

Mr. De Camp, custom house officer, made iron 30 years previous to 1818. He should call links parts of chains, welded or not, and the straight ones, braziers' rods cut up in pieces, fit for rabbet screws and many purposes. "The anchor iron I supposed pieces of anchors, and would be so considered by the trade. When these pieces leave the forge they are half made. If I wanted to make an anchor I should order the number of pieces, giving the weight, and I don't know how it would come invoiced. Never saw an invoice of it. I don't know whether it is an article of commerce, but I have seen small quantities come into port for 13 years past, like this. Never finished or made an anchor, but sold a great quantity of anchor iron to merchants, who sell to the anchor maker. If well drawn, not much to do but weld it."

On the part of the claimant, Mr. John H. Howland of New York, importer and dealer in iron for many years, testified that this invoice was not chains nor bar or bolt iron.

Mr. Cornell, a merchant, and five chain cable and anchor makers, including the most extensive in America, testified that links, straight, bent, and turned, and anchor iron, were an article of commerce well known by those names, and so ordered, bought, sold, and invoiced. That the anchor iron was equally finished with iron in bars and bolts, and the links more so. That both were more valuable for chains and anchors than bar or bolt iron, but if not used for these purposes they should sell the same for scraps. That these links are not a manufactured article, but partly manufactured, and are the raw material of the chain maker, as common bar and bolt iron is of the general smith, and as anchor iron is of the anchor maker. That links welded and finished separately, would be no part of a chain unless in a chain. That a chain or part of a chain is a series of links connected together, and these must be more than one. That the cost of making these straight links into chains is about $4 to $5 per cwt.—bent links 10 per cent. less, and turned $4.37½ to $5. That the general price of anchors is 11 to 12 cts. per lb.; and of anchor iron 5½ cts. That chain cable iron and anchor iron is a different kind of iron from bar or bolt iron, and much superior in quality, having no cinder in it, and higher in price, made in a particular way for the manufacture of cables and anchors. There is none in America suitable for the purpose, and experiments have proved it. The claimant also introduced the testimony taken in 1828, before congress, to show that congress in passing the law knew these articles as links, in which Mr. Keese' examination says, that at the Peru works they manufacture principally chain links and bar iron, and also the advertisements of the navy departments for links and anchor iron—to show that congress intended to leave these articles non-

enumerated, as bar iron could not possibly be imported in that form for any useful purpose, and as our own iron is not suitable, that the chain cable and anchor makers might have the advantage of a cheap raw material.

Much other testimony was taken, which, with the arguments of counsel, occupied the court six days; but our limits will not permit its insertion.

J. A. Hamilton, for the United States.
C. Walker and J. P. Hall, for claimant.

BETTS, District Judge. The forfeiture is claimed,—(1) Because, on inspection of goods, the invoice was found to have been made up with intent by false valuation, extension, or otherwise, to evade and defraud the revenue. There is no proof showing any erroneous valuation or extension in the invoice, and it is admitted by the district attorney that the forfeiture can only be sustained by force of the expression "or otherwise." He insists that the proof shows that the invoice was accompanied by a representation from manufacturers abroad, calculated and intended to induce the collector to allow the goods to be entered at a rate of duty lower than they were subject to by law, and that the inventory in correspondence with that proof was made up by a misdescription, a false denomination of the goods. The articles were entered as articles of manufacture subject to a duty of 25 per cent. ad valorem, and the affidavits of the manufacturers representing them to be so. It is contended on the part of the government that they were bar and bolt iron and anchors or parts of anchors, and liable to a specific duty, under the act of May 22, 1824, of 3 cents per lb. on the links and 2 cents per pound on the anchors. By the act of May 22, 1824, § 1, art. 5 [4 Stat. 25], a duty is imposed "on iron cables or chains or parts thereof" of 3 cents per pound, and "on anvils and anchors two cents per pound." By the act of May 19, 1828, § 1, art. 2 [4 Stat. 270], a duty is laid "on bar and bolt iron, made wholly or in part by rolling," of $37 per ton. The fifth article of the first section of the act of May, 1824, provides that "on all manufactures not otherwise specified, made of brass, iron, steel, pewter, lead, or tin, or of which either of these metals is a component material, a duty of 25 per cent. ad valorem shall be laid." The second article of the first section of the act of April 27, 1816 [3 Stat. 310], enacts that there shall be laid a duty of 15 per centum ad valorem on all articles not subject to any other rate of duty. The claimant insists that although he entered his importation as subject to duties under the act of 1824, yet that strictly it comes within the provisions of the law of 1816, and should be charged with only 15 per cent. duty.

To bring these articles within the scope of the libel under this branch of it, it must be found that they were subject to specific duties, and that the manner of charging them

upon the invoice is comprehended in the interdiction "or otherwise" of the act of 1830. The point has been most pressed in argument, that the court should now decide, whether they are not entitled to entry on the payment of 15 per cent. instead of 25.

It does not appear to me that the point is necessarily raised for decision in this cause. The allegation is that the goods were subject to specific duties, and that the claimant attempted a fraud upon the revenue in entering them as liable only to an ad valorem duty. If the general proposition is decided in favor of the claimant and his goods acquitted, it would be entirely gratuitous on the part of the court to go further, and settle between him and the officers of the custom house the rate of duty he should pay. The present question is one of forfeiture alone, and whether the goods are liable to specific or ad valorem duties, is an enquiry which can have no relevancy except as showing the motive of the party in preparing his invoice. As he entered them there as liable to 25 per cent. duty, and offered to pay that, it would be a useless speculation to enquire what the evidence of a fraudulent motive might be, had he endeavored to pass them at the lower rate, thereby saving 10 per cent. more to himself. We can, in justice, do no more than estimate the influence of the act done, and there would accordingly seem to be no utility in carrying our regards to a more supposable state of facts. The term "otherwise" in a penal law is liable to serious objection for want of that precision and certainty the citizen has a right to expect in the language of a law which is to confiscate his property; and no court could go further in giving it meaning and application by construction, than the plain intent of congress, manifested in the context of the term, imperiously demanded. The fourth section of the act of May 28, 1830, declares "that if any package shall be found to contain any article not described in the invoice, or if such package or invoice be made up with intent, by a false valuation or extension or otherwise, to evade or defraud the revenue, the same shall be forfeited." Having designated three delicta by this clause, each of which shall work a forfeiture of the goods, the enquiry is whether some other substantive and distinct offence was intended to be provided against by the term "otherwise," and, if so, whether it is to be interpreted to embrace every other fraud or evasion that may be devised, other than the three specifically designated. It is believed no sound administration of penal law can permit a range so unlimited and hazardous to language of a very equivocal import. The expression ought rather to be construed as suppletory to those preceding it, and as having relation to the same subject-matter. Congress no doubt intended to specify the modes in which offences followed by a forfeiture of property should be proved to have been committed, but as the enumeration might possibly omit some of-

fence coming clearly within the general classification, tho' varying in some accidents of form and manner from those named, used a phraseology broad enough to bring such equivocal acts within the statute. The statute should therefore be construed as applying only to cases of the same character with those enumerated, and not to any of a different and independent description.

The offence described by the act is "making up the package or invoice" in a particular way. The term "valuation and extension," apply to the invoice, and the "otherwise," as immediately associated with them, by juxtaposition and grammatical connection, ought undoubtedly to be read as having reference to the invoice also. By what method of making up an invoice other than by valuation or extension, can this fraud be committed? By omitting articles, that offence is provided for in a previous part of the section. But effect may be given to the term by applying it to a fraudulent misdescription of the invoice; though true to certain intents, yet being false and fraudulent as to the matters of duties to which the real article would be entitled. For instance, as entering refined sugar as white clayed, &c., the description actually given, tho' true in terms, not being the whole truth, such as represents the exact character of the commodity, and if acted upon at the custom house will leave the goods to pass with a lower rate of duty than they would pay under full denomination. In the case before the court, anchors or bar iron entered as anchor iron—parts of chain cables, as links—bolt iron as straight links—if done with intent to evade or defraud the revenue, would be making up the invoice otherwise than by false valuation or extension, and in a way calculated to evade the payment of duties, and so to give application and significancy to this branch of the statute. It would thus become the false charges and the want of correspondence of the goods mentioned in the preceding part of the section, as all the articles of the libel proceed upon the allegation of a false denomination, or description of the goods imported.

This controlling question on the merits of the cause may as well be discussed under this branch of the case, as in connection with any of the other charges of the libel. The different forms in which the offence is stated in the libel so as to bring it under some of the prohibitions of the statute are comprehended in and depend upon the proposition that what is called in the invoice "anchor iron," is bar iron or anchors; and what are called "straight links," are bolt iron or braziers' rods; and what are called "bent and turned links," are parts of chain cables, or chains, and that these false descriptions are given with intent to evade the payment of duties. If this proposition is true, the goods would be subject to forfeiture under the branch of the libel now dis-

cussed; and if not true there is no matter set forth in any other part of the libel that would subject them to forfeiture. Without therefore waiting to arrange the proofs under the various charges of the libel, the most commodious and perspicuous mode of considering it will be to bring it in review under the head of the pleadings.

A critical examination of the evidence produced on the part of the government cannot fail to show that the allegations upon which the property was seized are too feebly supported to justify a condemnation for these causes alone, and if the proofs make out a case involved in some uncertainty and doubt, the doubt raised is not as to the accuracy of the invoice and entry (which would impose on the claimant the obligation of proving their correctness and bona fides [The Luminary] 8 Wheat. [21 U. S.] 411), but is whether a probable cause for seizure existed. The invoice and entry described the first item under consideration to be "ten pieces of anchor iron." The specific charge in the libel, applicable to this commodity, is, that it was iron in bars; although in the proceedings and argument it was considered to be anchors, or parts of anchors, and that it did not correspond with the invoice because of that misnomer. The only witness on the part of the United States personally conversant and experienced in the iron business, who considers these as parts of anchors, is Mr. De Camp. But he is exceedingly indistinct and uncertain in his judgment as to the denomination it has acquired in commerce, and he unites with the other experienced witnesses, on the part of the United States, in saying it is not known as "bar iron," that it is both more refined and of higher value than bar iron, and also is carried forward to a state of manufacture adapted to making anchors, and is more valuable for that use than any other.

Mr. Ayres says it is known in commerce as "anchor iron," is so imported, invoiced, and sold; and the general bearing of the proofs for the government is, that an order for anchor iron would be as distinct and well understood in business as for any other article in the iron trade. Under this proof, without adverting to the very full and satisfactory evidence on the part of the claimant in this behalf, it cannot be maintained that the article entered as anchor iron did not correspond with the invoice describing it as such. If it was not to be considered a manufacture, but the raw material for the trade and business of anchor making, yet it is put beyond all doubt by the proofs that it has acquired a settled and notorious denomination entirely distinguishing it from bar iron. So, also, it cannot be termed an "anchor," and be liable to a specific duty as such, because it has to undergo an important modification and manufacture to bring it from its present state into that of anchors. The act of 1824 imposed a duty on anchors, and not, as

is assumed in the report of the merchants who inspected this importation, on anchors and "all parts thereof." The latter provision is made in the act of July 14, 1832 (section 1, art. 9), but this importation does not come under the provisions of the latter statute.

So as to the other parts of this entry. The testimony of Messrs. Mead, Saltus, and Ayres, on the part of the United States, is clear and unequivocal, that the articles inventoried and entered as straight, bent, and turned links are well known in commerce by those denominations. They are manufactured and sold by these appellations; the straight and bent are common in our market, and pass by the name of "links"—the turned are an English fabric, and seem to have been imported solely by the claimant. All the witnesses however agree in terming it a "link," and the appraiser, using the same denomination, details the mode of its manufacture. This species of links and the bent ones were unquestionably within the general description of links, and whether they are more, and compose parts of chains, will be more particularly noticed presently. Those called "straight links" have the appearance of ordinary braziers' rods shortened to a standard length, fitting them for chain links. The rod is no other way changed than by cutting it into pieces. It has been strenuously argued that this is only a simulated manufacture, still leaving the raw material to answer many valuable uses to which it is ordinarily applied, and that the alteration is fraudulent; intended to introduce the article in its present form at an impost below what it is legally liable to. Although in the opinion of some of the witnesses, iron cut into these short pieces may be used to advantage for bolts, screws, spikes, &c., yet by far the greatest weight of evidence is, that, unless manufactured into links, it would be only marketable or useful in this form, as scrap iron. And the proof both of the witnesses on the part of the United States and the claimant, places the fact above question, that the article in this form is a well known commodity, manufactured here and imported from abroad, and bought and sold under the name of "straight links," and that it is in well established use for making chains, and is most valuable for that purpose. This proof is abundantly sufficient to show that the articles found in the packages correspond with the invoice, and that they were properly entered as links, if they are not something more than merely links.

The remaining enquiry then is, whether all the links are not subject to duty as parts of chains. There can be no doubt that in correctness of language every distinct component portion of an entire thing, is a part of that thing. In this sense a link is a part of a chain, as a wheel, spring, or chain is a part of a watch, each of them essential to the existence of the particular thing. The act of congress laying a like duty upon "cables or parts thereof," includes within the letter, the separate links, as well as the series united in a chain, and would accordingly be so applied, unless a different signification be given by usage, and is well known to those conversant with the particular article; or the connection in which the expression is used denotes that it is to receive a more comprehensive meaning. In seeking the proper interpretation of the phrase "parts thereof" as applicable to chain cables, we discover at the first step, that custom (norma loquenda of laws, as well as of society) has affixed a meaning to the first element of the subject (links) essentially variant from its acceptation in the strict sense of the term. A link, considered as a substantive article of manufacture, must unquestionably be finished, have every operation performed upon it required to fit it for the use it is destined for; whether round or oval, open or closed, it becomes the link only when the artisan has completed his labor upon it. The link which forms part of a chain cable must necessarily be closed; neither a straight piece of rod, nor bent at one end, nor turned so as to bring the two ends nearly into union, can in accuracy be said to compose that description of link. Usage, however, as it has been abundantly proved, does give the name of "links," to things intended to form chain cables, that cannot compose such cable without great additional labor and manufacture, and if in like way the expression "parts of chains" has obtained a meaning different from the literal import, the rule which adopts the customary appellation in the one case, ought also to give it the same force in the other. The evidence very satisfactorily shows that chain cables are imported entire and in fragments or sections of several fathoms in length, which can be united by shackle links, or opening an ordinary link so as to supply the length that may be required, and that such sections of the chain are known in commerce as parts of cables or chains, the part being complete as a chain of itself, but of less length than the cable commonly required. As this is the denomination the commodity receives from the dealer, the manufacturer, and those conversant with it, the presumption is exceedingly forcible that the law of 1824 contemplated those sections as the parts of chains which are made liable to the same duty as the entire chain. But whether this be so or not, it is very clear to my mind, that in the sense of the act of 1824, nothing can be deemed part of the chain that is not, as to itself, as finished and complete as the entire chain. It matters then very little in this case whether, in the interpretation of the act, single links should be accepted as parts of chains inasmuch as to acquire that quality, they must be finished and perfected as links. Nevertheless the construction I put upon the act, in view of the facts disclosed by the evidence in this cause, and which it is proper to avow, is, that parts

of chains and pieces of chain are synonymous, and mean a series of links comprising a section less than the chain as usually imported. In this view of the subject, the part may consist of several fathoms, or any less extent beyond individual detached links. It denotes a portion taken from the whole, and still retaining the properties of the whole, less only the extent. In either view of the subject these articles are not liable to condemnation for the causes alleged.

The district attorney has argued that the importer is bound to swear that the entry is true in all particulars, and that these goods being entered as manufactured articles, and subject to a duty of 25 per cent., if it is found that they cannot with justice be denominated "manufactured," or are subject to specific duties, they must be forfeited for those causes. The answer to this argument is, that the goods have not been proceeded against as improperly described in the entry, nor is any statute shown subjecting them to forfeiture for that cause. The allegation of the libel is, that the goods on examination and inspection were found not to correspond with the description in the invoice, and it is for that variance that the act of 1830 subjects property to forfeiture. And it may be further observed, that it is not shown that an erroneous claim at the custom house in respect to the duties payable upon imports affects the importation or entry, when the goods are correctly described. Probably it is of constant occurrence at the custom house, that merchants and the collector differ as to the rate of duties to be applied to an entry, when the goods are accurately and exactly denominated. The court know judicially, that such differences have sometimes occurred, and that the construction the merchants claim for the laws has been upheld in all the courts. Had it been invariably otherwise, congress would deal with most ungenerous severity with the citizen, by confiscating his property for a difference of opinion, which would do the revenue no harm, as the thing is placed undisguisedly in the hands of the public officers, for them to judge whether the merchant is correct, or not, in his estimate of the character of the commodity, and they have the power, in the first instance, of enforcing their construction of the laws by retaining the goods until he pays the duties they demand. In my opinion a misdescription of that character would not afford ground for forfeiture of the goods.

The following decree was entered. This cause having been brought to hearing upon the pleadings and proofs, and having been argued by Mr. Hamilton, the attorney of the United States, on the part of the United States, and by Mr. Walker and Mr. Hall, on the part of the claimant, and the premises having been fully considered by the court, it is considered and declared, that the charges in the libel, purporting that the goods specified in the entry were falsely described in the invoice mentioned in the pleadings, with intent to evade and defraud the revenue, are sufficient in law to subject such goods as were imported in boxes to forfeiture under the provision of the fourth section of the act of May 28, 1830. But it is considered and declared that anchors, or anchor iron imported in bulk, and not in packages or bundles, are not subject to forfeiture, under the provisions of the said section, and if they were so, it is further declared that it is established by the proofs in the cause, that "anchor iron" is a commodity well known in commerce and to artisans by that appellation, and is distinct and different from the article denominated "bar iron," or "iron in bars"; and that the commodity seized and articled upon in this cause corresponds with the description thereof in the invoice. And it is further considered and declared, that it is established by the proofs in the cause, that the articles described in the invoice as "straight links," "bent links," and "turned links," are articles well known in commerce, and to artisans, by those names and denominations, and are not, nor is either of them, "bar or bolt iron," within the acceptation of that term in ordinary usage in trade and commerce; that they have been subjected to a process of manufacture by machinery and manual labor, changing them from the raw material into articles of enhanced value, for the particular uses to which the change has adapted them; and that they correspond with the descriptions thereof in the invoice. And it is further considered and declared, that it is established by the proofs in this cause, that cables or chains, or parts thereof, as known and denominated in commerce and by artisans, consist of a series of finished links, and that one unfinished link or any indefinite number of unfinished links, are not denominated "cables or chains, or parts thereof," and are not known as such. Therefore it is considered, adjudged, and decreed by the court, and his honor, the district judge, by virtue of the power and authority in him vested, doth order, adjudge, and decree, that the goods, wares, and merchandise specified in the pleadings in this cause, and seized by the collector as forfeited, were not entered at the custom house in this port as charged in the libel, by a false denomination, or description; and that the packages or invoices thereof were not, nor was either of them, made up with the intent to evade or defraud the revenue, and that none of the said packages contained any article not described in the invoice thereof; and it is therefore further considered and decreed, that the goods, wares, and merchandises, described in the pleadings, be acquitted of the seizure thereof, and be forthwith delivered up to the claimant. But inasmuch as it is made to appear in the proofs that the public appraisers, and two merchants sworn to assist in the examination of the goods aforesaid, reported to the collector that, in their opinion, the importation and entry thereof had been fraudulently made

with intent to evade the revenue, and recommend a seizure thereof, it is ordered that a certificate of probable cause of seizure be allowed and entered.

From this decree the United States district attorney has appealed. [Case unreported.]